# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KAREEM HASSAN MILHOUSE,** | : | **CIVIL NO. 1:CV-09-01365** |
| | : | |
| **Plaintiff** | : | **(Judge Rambo)** |
| | : | |
| **v.** | : | |
| | : | |
| **LIEUTENANT JORDAN, *et al.*,** | : | |
| | : | |
| **Defendants** | : | |

## M E M O R A N D U M

Plaintiff Kareem Hassan Milhouse ("Milhouse"), a federal inmate currently

incarcerated at the United States Penitentiary in Lewisburg, Pennsylvania ("USP-

Lewisburg"), filed a *Bivens*[1] action under 28 U.S.C. § 1331 on July 16, 2009 (Doc. 1),

as amended on December 21, 2009 (Doc. 31), against a number of employees of USP-

Lewisburg and the Bureau of Prisons ("BOP").[2]  Milhouse's claims arise from the use

---

[1]     *Bivens* actions are the federal counterpart to § 1983 claims brought against state officials.  *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (citing *Brown v. Phillip Morris, Inc.*, 250 F.3d 789, 800 (3d Cir. 2001)).  "[C]ourts have generally relied upon the principles developed in the case law applying section 1983 to establish the outer perimeters of a *Bivens* claim against federal officials."  *Schrob v. Catterson*, 948 F.2d 1402, 1409 (3d Cir. 1991).

[2]    Milhouse names as Defendants the following individuals: B.S. Bledsoe, USP-Lewisburg's Warden; Chuck Maiorana, Associate Warden of FCC-Allenwood; Frank Passaniti, former Captain at USP-Lewisburg; Lieutenant A. Jordan; K. Rear, Associate Warden; Steve Brown, Health Services Administrator; J. Hemphill, Physician Assistant ("PA"); Mark Peoria, PA; I. Navarro, PA; F. Fasciana, PA; L. Potter, Paramedic; and Anthony Bussanich, M.D., Clinical Director of MCC-NY, (collectively, "Defendants.") (Doc. 31.)

of force during an incident which took place on May 14, 2009, and allegations that subsequently, he did not receive appropriate medical care for his alleged injuries.

Presently before the court is a partial motion to dismiss the amended complaint, and for summary judgment, filed by Defendants.  (Doc. 53.)  For the reasons that follow, the motion for summary judgment will be granted.

## I.   Background

### A.   Facts

The following facts are undisputed except where noted.  On the morning of May 14, 2009, USP-Lewisburg's Health Services staff evaluated Milhouse in order to get a baseline record of his health status, due to a belief that Milhouse was on a hunger strike.[3]  (Doc. 65 ¶ 1; Doc. 76 ¶ 1.)  Health Services staff noted Milhouse's vital signs and weight and counseled him on the consequences of being on a hunger strike.  (Doc. 65 ¶ 2.)

Defendants assert that under BOP policy, inmates who are on a declared hunger strike are normally single-celled so that medical staff can accurately monitor their

_____

[3]  Defendants claim that this evaluation was performed at approximately 10:15 a.m., (Doc. 65 ¶ 1), but Milhouse claims the evaluation took place earlier in the day, at approximately 7:00 a.m., (Doc. 76 ¶ 1).

food intake.  (*Id.* ¶ 3.)  However, Milhouse claims that at 8:00 a.m. on May 14, 2009,

his case manager told him to "pack up, your [sic] being moved to a cell with another

inmate that's on a hunger strike so the water could be turned off."  (Doc. 76 ¶ 2.)

Milhouse informed his case manager that he was not currently on a hunger strike, and

requested that the unit's surveillance cameras be reviewed in order to confirm that he

had been consuming his meals since May 12, 2009.[4]  (Doc. 76 ¶ 2.)

Later that same morning, Defendant Lieutenant Jordan was notified that

Milhouse was refusing to be moved to another cell.  (Doc. 65 ¶ 4.)  Lieutenant Jordan

then spoke personally with Milhouse, who repeatedly refused the orders to move to

another cell.  (*Id.* ¶ 5.)  Milhouse claims he told Lieutenant Jordan during this

conversation that he was no longer on a hunger strike, as he had been taking his meals

since May 12, 2009.  (Doc. 76 ¶ 3.)

During Lieutenant Jordan's visit to the cell, Milhouse's cellmate refused to

speak with him, and both inmates refused to submit to hand restraints.  (Doc. 65 ¶ 6.)

As a result of this refusal, a use of force team was assembled to remove Milhouse and

his cellmate from the cell.  (*Id.* ¶ 7.)  In connection with this, Health Services

informed Lieutenant Jordan that inmates should not be subjected to chemical agents.

---

[4]  Milhouse asserts that he explained to various prison officials that he was not, in fact, on a hunger strike on that day.  (Doc. 76 ¶¶ 1-4.)

(*Id.* ¶ 8.)  Instead, Lieutenant Jordan secured authorization to introduce foam rubber baton rounds utilizing an L-8 projectile launcher should the cellmates continue to the refuse the order.  (*Id.* ¶ 9.)

At approximately 11:30 a.m., Lieutenant Jordan and the use of force team approached Milhouse's cell.  (Doc. 76 ¶ 4.)  At that time a staff member from the psychology department attempted to speak with Milhouse and his cellmate in an effort at confrontation avoidance; however, these efforts were not effective.  (Doc. 65 ¶ 10.) Lieutenant Jordan then gave both inmates another direct order to submit to restraints, but both inmates refused this direct order.  (*Id.* ¶¶ 11, 12.)  Lieutenant Jordan noted that Milhouse stood at the back wall of the cell and his cellmate climbed onto the top bunk and laid down.  (*Id.* ¶ 13.)  Lieutenant Jordan warned the inmates that he would use the non-lethal munitions if they did not comply with the order to submit to restraints.  (*Id.* ¶ 14.)  Milhouse claims that he told Lieutenant Jordan that he was no longer on a hunger strike.  (Doc. 76 ¶ 4.)  Lieutenant Jordan then told staff to open the cell door's slot,  and he shot four rounds of the foam baton into the cell.  (Doc. 65 ¶ 15; Doc. 76 ¶ 4.)  Three rounds were directed at Milhouse, who moved to the bottom bunk under his mattress.  (Doc. 65 ¶ 16.)  One round was directed at his cellmate who was still on the top bunk.  (*Id.* ¶ 17.)

After these shots were fired, the inmates continued to refuse to submit to hand restraints. (*Id*. ¶ 18.) As a result, the use of force team entered the cell and ambulatory restraints were applied to both inmates. (Doc. 65 ¶ 19; Doc. 76 ¶ 5.) Milhouse was not compliant during this process, refused to walk, and had to be carried to another cell by the use of force team. (Doc. 65 ¶¶ 20, 21.) However, Milhouse's cellmate was compliant and walked to a new cell assignment. (*Id*. ¶ 22.) Milhouse asserts that his new cell contained only a metal bedframe, and was soiled with feces, urine, and "other identified substances." (Doc. 76 ¶ 5.) He remained in that cell overnight and was removed from restraints on May 15, 2009. (Doc. 64-2, Attach. 5, at 41.)

In support of their motion for summary judgment, Defendants have also provided the court with videotape footage of the May 14, 2009 cell extraction, which, pursuant to court order, has been filed under seal.[5] (Doc. 58.) The contents of the videotape footage reveal the following. Two teams of five corrections officers

---

[5] By order dated September 28, 2010, Defendants were directed to redact the videotape footage and provide the redacted footage to Milhouse with a means to view it and paper and a writing instrument to take notes. (*See* Doc. 133.) The full version otherwise remained under seal. (*Id*.) Milhouse was also afforded the opportunity to file a further response to the motion for summary judgment. (*Id*.) Instead, Milhouse filed two motions for additional discovery in which he sought further video footage, including portions of the sealed videotape. (*See* Docs. 134 & 137.) By order dated January 27, 2011, the court denied Milhouse's motions. (Doc. 147.)

gathered outside the SMU to perform the extraction at 11:38 a.m.  The officers on the extraction teams wore protective gear, including pads, vests, and helmets with face shields.  Lieutenant Jordan spoke to the camera, stating that the purpose of the extraction was to remove Milhouse and his cellmate from their cell due to the cellmates' refusal to move to another cell in order to monitor Milhouse's hunger strike and confirming the authorization by Warden Bledsoe.  Each member of the teams then introduced him or herself and stated his or her duty.  An equipment check was performed and the teams exited the room to travel to the SMU.

When the teams reached the cell, Milhouse was at the door, but quickly moved to the cell's back window when he saw the teams.  His cellmate came to the door and told the staff member attempting confrontation avoidance that he would not submit to restraints.  Milhouse refused to speak with staff and remained in the back of the cell.  After the confrontation avoidance staff member backed away from the door, Lieutenant Jordan asked both inmates to come to the door to cuff up.  He asked them four times, and included a "final" order to cuff up.  He then opened the cell door tray slot and pointed the foam baton launcher into the cell.  He again ordered the inmates to come to the door to cuff up or they would be shot.  He then shot one round in the direction of Milhouse and told the inmates two more times to come to the door to cuff up.  They refused, and he shot another round in the direction of Milhouse's cellmate,

who had climbed to the top bunk. Lieutenant Jordan then told them again to come to the door to cuff up, shot a third round into the cell, told them to cuff up, shot a fourth round into the cell, and then retreated from the door. Subsequently, Lieutenant Jordan directed both extraction teams to enter the cell. At this point, the footage does not reveal the specific actions of the teams in securing both inmates because of the number of officers in the small cell, and also because most members of the teams had their backs to the camera. The footage does show Milhouse's cellmate voluntarily submitting to ambulatory restraints, but it is not possible to see Milhouse for several minutes in the back of the cell while his cellmate is being cuffed up.

Once Milhouse's cellmate is restrained, the footage shows Milhouse face down on the floor towards the back of the cell with restraints around his ankles. Five men are surrounding him and there is no clear view of Milhouse beyond his feet. After several minutes, the extraction team picks him up and places him in a seated position facing the camera while one team member continues to adjust his restraints. Milhouse is then brought to a standing position and Lieutenant Jordan enters the cell to check the restraints of both inmates. In addition, a PA enters the cell to check the restraints.

At this point, both extraction teams exit the cell with the inmates. The first team walks Milhouse's cellmate out of the cell. The second team, however, carries

Milhouse face down, holding his legs and arms. The teams travel down a set of stairs with the inmates to another floor in the cellblock. When they arrive at the new cell for Milhouse's cellmate, they place Milhouse on the floor, face down. As the other team prepares to place Milhouse's cellmate in a new cell, Milhouse can be heard saying, "I told you you'll have to kill me in this [expletive] man, you'll have to kill me in here eventually, you'll have to. Because I ain't going for none of this [expletive]. Mail me out in a box, man." Once Milhouse's cellmate is secured in a new cell, the second team picks up Milhouse by the arms and legs again and they travel down another set of stairs. Milhouse can again be heard saying, "Mail me out in a box, man." When the team takes a break on the stairs, Milhouse says, "Drop me. I told you, mail me out." When the team arrives at a new cell for Milhouse, initially at least six or seven individuals can be seen entering the cell with Milhouse. Most members of the team have their backs to the camera, but when they exit the cell, it is possible to see that Milhouse had been left in the cell, face down with restraints still applied to his hands. There does not appear to be anything on the walls or floor. The footage then ends with the teams traveling back to the unit office for a debriefing.

After being transferred to new cells, both inmates were examined by Defendant PA Hemphill. (Doc. 65 ¶ 23.) PA Hemphill noted that Milhouse had an "approx. 2cm

area of superficial abrasion x 3 on his abdomen, with similar areas on his left forearm and right posterior leg." (*Id*. ¶ 24; Doc. 64-2, Attach. 3.) Defendants state that no first aid was necessary and Milhouse was advised to follow up at sick call as needed. (Doc. 65 ¶ 25.) Milhouse, however, counters that he asked PA Hemphill to examine him and Hemphill's response was, "we don't do that here." (Doc. 76 ¶ 6.) He asserts that he showed PA Hemphill his bleeding wounds, and Hemphill stated, "soap & water." (*Id*. ¶ 6.) He was then left in the ambulatory restraints in the dry cell with no water. (*Id*.)

Milhouse was examined multiple times by Defendant PA Potter on May 14, 2009, and several times over the next month by various medical providers, and treated for the complaints he presented. (Doc. 65 ¶ 26; Doc. 76 ¶ 7; *see also* Doc. 64-2, Attach. 4.) Milhouse asserts that on May 15, 2009, he requested medical attention for his wounds from Defendant PAs Navarro and Fasciana, who were in the unit visiting other inmates, but they simply exited the unit without providing assistance. (Doc. 76 ¶ 8.)

Further, Milhouse asserts that on May 20, 2009, while Defendants Bledsoe, Rear, Passaniti, Maiorana, and Brown were making administrative rounds in the unit, Milhouse showed them his wounds which he claims were open, bleeding and pussing.

9

(*Id*. ¶ 9.)  Defendants Bledsoe and Rear have submitted declarations specifically denying that either one of them witnessed those wounds.  (Doc. 64-2, Attachs. 6, 7.) Milhouse also asserts that he submitted numerous requests to staff, including some Defendants, about the lack of medical treatment and the use of force upon him, and explained again that he was not on a hunger strike at the time of the incident on May 14, 2009.  (Doc. 76 ¶ 10.)  According to Milhouse, Defendants Hemphill and Peoria responded that they do not treat his type of injuries.  (*Id*. ¶ 11.)

The Health Services Clinical Encounter report, attached as an exhibit to Defendants' motion, reveals the following with respect to Milhouse's medical care during the relevant time period.  On May 20, 2009, after receiving a sick call request from Milhouse, PA Peoria examined Milhouse at his cell for lesions to his upper and lower abdomen, a trunk abrasion, and a friction burn without infection.  (Doc. 64-2, Attach. 3, at 18-19.)  Milhouse received counseling for a plan of care and was told to follow up at sick call as needed.  (*Id*. at 19.)  On May 26, 2009, PA Peoria saw Milhouse in response to his request for a refill of his asthma inhaler.  (*Id*. at 20-21.) The refill was ordered and Milhouse was directed to follow up at sick call or the chronic care clinic as needed.  (*Id*. at 20.)  Also on May 26, 2009, Milhouse was given a copy of his injury assessment which was dated May 14, 2009.  (*Id*. at 22.)  On June

1, 2009, PA Hemphill saw Milhouse in response to a complaint of pain, described as unspecified monoarthritis. (*Id*. at 23-24.) A refill of naproxen was ordered. (*Id*.) On June 9, 2009, a registered nurse saw Milhouse for complaints of rectal bleeding and abdominal pain. (*Id*. at 25.) Prednisone was prescribed and tests were ordered. (*Id*.) On June 10, 2009, per a request from Milhouse, CTM tablets were ordered. (*Id*. at 26.) On June 16, 2009, Milhouse was given copies of his clinical encounters from May 18, 2009, through June 10, 2009. (*Id*. at 27.) On June 18, 2009, Milhouse was seen at Health Services by PA Navarro for his high cholesterol, and tests were ordered. (*Id*. at 28.) On June 22, 2009, Milhouse received a follow-up visit from PA Peoria related to his complaints of insomnia. (*Id*. at 29-30.) He was informed that BOP guidelines prohibit prescription medication for insomnia, but was told to follow up at sick call as needed. (*Id*. at 29.) In addition, PA Peoria noted that he would refer Milhouse to the psychology chief. (*Id*.) On June 23, 2009, PA Peoria saw Milhouse at sick call in response to his request for allergy tablets. (*Id*. at 31-32.) PA Peoria issued 4mg CTM tablets. (*Id*. at 31.) Also on June 23, 2009, Milhouse received a follow-up visit from PA Peoria regarding his June 9, 2009 complaints of abdominal pain. (*Id*. at 33-34.)

As a result of his involvement in the May 14, 2009 incident, Milhouse received a disciplinary incident report for "refusing a program assignment; refusing an order; and threatening." (Doc. 65 ¶ 27; Doc. 64-2, Attach. 5.) A hearing was held before a disciplinary hearing officer ("DHO") on July 7, 2009.[6] (Doc. 65 ¶ 28.) After reviewing the video footage of the incident and Milhouse's statement regarding the incident, the DHO concluded that the greater weight of the evidence supported the finding that Milhouse had committed the act of "refusing an order," and not the other charges. (Doc. 65 ¶¶ 28, 29; Doc. 64-2, Attach. 5.) The DHO sanctioned Milhouse to the following: disallowance of 14 days of good conduct time; 15 days of disciplinary segregation; 120 days loss of commissary privileges; and 120 days loss of visiting privileges. (Doc. 65 ¶ 30; Doc. 64-2, Attach. 5.)

## B.    Procedural History

On July 16, 2009, Milhouse filed his initial complaint. (Doc. 1.) By order dated August 24, 2009, the court directed him to file an amended complaint pursuant to the preliminary screening provisions under 28 U.S.C. § 1915. (*See* Doc. 10.) Milhouse filed an amended complaint on September 28, 2009. (Doc. 12.) Service of the amended complaint was directed by order dated September 30, 2009. (Doc. 13.)

_____

[6] The initial hearing was held on June 23, 2009, but continued in order for the DHO to review the video footage of the May 14, 2009 incident. (*See* Doc. 64-2, Attach. 5.)

However, on December 17, 2009, Milhouse filed a motion to amend his complaint, and attached a proposed complaint. (Doc. 28.) The court granted Milhouse's motion on December 21, 2009, and accepted the second amended complaint (Doc. 31) for filing. (Doc. 30.)

On March 18, 2010, Defendants filed their motion to dismiss in part and for summary judgment. (Doc. 53.) A brief in support and statement of material facts followed on April 1, 2010. (Docs. 64, 65.) Responsive and reply briefings have been filed. Thus, the motion is ripe for disposition.

## II. **Standards of Review**

### A. **Motion to Dismiss**

Defendants have filed a motion which, in part, seeks dismissal of the amended complaint on the grounds that Milhouse's complaint fails to state a claim upon which relief can be granted, as provided by Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion, however, goes beyond a simple motion to dismiss under Rule 12(b)(6) because it is accompanied by evidentiary documents outside the pleadings which contravene Milhouse's claims. Rule 12(d) provides as follows:

> If, on a motion under Rule 12(b)(6) or (12)(c), matters outside the pleadings are presented to and not excluded by the court, the motion must

be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). The court will not exclude the evidentiary materials accompanying Defendants' motion to dismiss because Milhouse has also been given a reasonable opportunity to present material relevant to the motion. Thus, Defendants' motion to dismiss and for summary judgment shall be treated solely as seeking summary judgment.[7]

---

[7] In the instant motion, Defendants argue that certain aspects of Milhouse's amended complaint should be dismissed under the motion to dismiss standard. First, Defendants argue that Milhouse's claims for money damages against the individual Defendants in their official capacities are barred by the doctrine of sovereign immunity. While *Bivens* allows claims for damages against federal agents, it does not allow claims for damages to be brought against federal agencies, regardless of any waiver of sovereign immunity. *F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994). And, actions against individuals in their official capacities are "in all respects other than name" suits against the government entity. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). As such, Milhouse's official capacity claims are claims against the United States, which cannot be sued for money damages without an "unequivocally expressed" congressional waiver of sovereign immunity. *United States v. Idaho ex rel. Director, Idaho Dep't of Water Res.*, 508 U.S. 1, 6 (1993); *United States v. Testan*, 424 U.S. 392, 400 (1976). The United States has not waived its sovereign immunity from suits for damages arising from constitutional violations. *See, e.g., Keene Corp. v. United States*, 700 F.2d 836, 838 n.3 (2d Cir. 1983).

Second, Defendants argue that Defendant PA Hemphill should be dismissed as a party in this action because he is a member of the U.S. Public Health Service. Defendant PA Hemphill is a commissioned officer of the Public Health Service ("PHS"). (Doc. 64-2, Attach. 7, Bledsoe Decl., at ¶ 5.) The Federal Tort Claims Act ("FTCA") is the exclusive remedy for injury relating to PHS officers' performance of medical functions within the scope of their duties. *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000). *See also Hodge v. United States*, No. 3:06-CV-1622, 2007 WL 2571938, at *4-5 (M.D. Pa. Aug. 31, 2007) (dismissing *Bivens* claim against a PHS physician, observing that the FTCA is the exclusive remedy in such a case).

The remedy against the United States provided by sections 1346(b) and 2672 of Title 28 [the FTCA] . . . for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct

**B.    Motion for Summary Judgment**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id*. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit

---

of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

42 U.S.C. § 233(a).  Thus, Milhouse cannot bring a *Bivens* claim against Defendant Hemphill to seek redress for his injury, but instead must bring a claim against the United States under the FTCA. *Cuoco*, 222 F.3d at 108.
    Because the court will grant summary judgment in favor of all Defendants on the merits of Milhouse's claims, it need not consider these aspects of the amended complaint under the motion to dismiss standard.

back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

Finally, in a case such as this where there is a videotape recording of the incident in question, here an alleged excessive use of force, the court need not adopt the non-movant's version of the facts if the videotape recording "blatantly contradict[s]" the non-movant's version "so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    Discussion

16

Milhouse claims that Defendants violated the Eighth Amendment when they employed a use of force team to extract him from his cell and subsequently were deliberately indifferent to his serious medical needs resulting from that extraction. In their brief in support of the instant motion, Defendants have raised the issue of qualified immunity.[8] Milhouse also claims Defendants retaliated against him for filing grievances. Defendants counter that Milhouse has failed to state a claim of retaliation. The court will address these issues in turn.

**A.**     <u>**Eighth Amendment Claims**</u>

As stated above, Defendants have raised the issue of qualified immunity in response to Milhouse's Eighth Amendment claims arising from the May 14, 2009 cell extraction. The doctrine of qualified immunity provides that government officials performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009). This doctrine, known

---

[8] Defendants seemingly concede that Milhouse has exhausted the administrative remedy procedure with respect to the claims raised in his second amended complaint. (*See* Doc. 64 at 11 n.3.) To that end, Defendants indicate that Milhouse has filed 298 requests for administrative remedy from May 14, 2009, the date of the incident, to date of the filing of their brief in support of the instant motion. (*Id.*) Thus, the court need not address the threshold issue of exhaustion of administrative remedies with respect to any of Milhouse's claims.

as "qualified immunity," provides not only a defense to liability, but "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Application of qualified immunity implicates two distinct inquiries. The first evaluates whether the defendant violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated in part by Pearson*, 555 U.S. 223, 129 S. Ct. 808; *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007); *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not commit a constitutional infraction, the court must dispose of the claim in the defendant's favor. *Saucier*, 533 U.S. at 201. If the defendant committed a constitutional violation, the second inquiry assesses whether the right in question was "clearly established" at the time the defendant acted. *Pearson*, 555 U.S. 223, 129 S. Ct. at 816; *Saucier*, 533 U.S. at 201-02. A right is "clearly established" if a reasonable state actor under the circumstances would have known that his or her conduct impinged upon constitutional mandates. *Pearson*, 555 U.S. 223, 129 S. Ct. at 816. Further, the Third Circuit has stated that "[A] right is clearly established for the purposes of qualified immunity when its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hubbard v. Taylor*, 538 F.3d 229, 236 (3d Cir. 2008) (quoting

*Williams*, 455 F.3d at 191). This standard "'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Hubbard*, 538 F.3d at 236 (quoting *Gilles v. Davis*, 427 F.3d 197, 203 (3d Cir. 2005)). The court is not required to conduct the inquiries sequentially,[9] and it may eschew difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. *Pearson*, 555 U.S. 223, 129 S. Ct. at 820.

Proceeding under the above framework, the court will examine Milhouse's Eighth Amendment claims to determine whether Defendants are entitled to qualified immunity, and whether summary judgment is warranted.

### 1. Use of Excessive Force

In order for a prisoner to state an Eighth Amendment claim for the excessive use of force by a prison official, he must establish that the force was not applied in a good-faith effort to maintain or restore discipline, but that it was maliciously and

---

[9] In *Pearson*, the Supreme Court held that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. 223, 129 S. Ct. at 818.

sadistically used to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). "In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) 'the need for the application of force;' (2) 'the relationship between the need and the amount of force that was used;' (3) 'the extent of injury inflicted;' (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them;' and (5) 'any efforts made to temper the severity of a forceful response.'" *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). The prisoner need not show significant injury to state an excessive use of force claim. *Hudson*, 503 U.S. at 8, 10. However, "[t]hat is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de mimimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id*. at 9-10 (citations omitted).

Moreover, in assessing a claim of cruel and unusual punishment, a court must bear in mind that "a prison's internal security is peculiarly a matter [for] the discretion of prison administrators." *Whitley*, 475 U.S. at 321 (quoting *Rhodes*, 452 U.S. at 349

n.14)). Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). As a general rule, judges should not second guess decisions made by prison administrators faced with disturbances or other emergencies affecting prison security. *Id*. at 322.

Examining the circumstances of this case under the *Whitley* factors, the court concludes that a reasonable trier of fact would conclude that Milhouse has failed to set forth a claim of excessive force with respect to the use of force incident on May 14, 2009. Milhouse has not presented any evidence that would establish there is an issue of material fact as to whether Defendants acted to "maliciously and sadistically cause harm" to him when he was extracted from his cell on that day. *Hudson*, 503 U.S. at 7. In fact, the evidence shows that Milhouse was extracted from his cell by a use of force team because he refused to comply with an order to submit to restraints in order to effectuate a cell transfer. The fact that Milhouse claims that BOP officials mistakenly believed he was on a hunger strike that day and therefore that is why he was removed from his cell is immaterial in light of the video evidence that clearly demonstrates that Milhouse was extracted from his cell by a use of force team for failing to submit to

21

hand restraints. Stated otherwise, even if the very reason for a cell move was BOP officials' mistaken belief that Milhouse was on a hunger strike, he was ultimately removed from his cell by a use of force team for failing to submit to hand restraints, not because he was on a hunger strike.[10] Thus, the court finds that Milhouse has failed to set forth an Eighth Amendment claim with respect to the use of force incident on May 14, 2009, and qualified immunity shields Defendants from suit. Defendants' motion for summary judgment on this issue will be granted.

### 2. Deliberate Indifference to Serious Medical Needs

To demonstrate a *prima facie* case of Eighth Amendment cruel and unusual punishment based on the denial of medical care, a plaintiff must establish that the defendants acted with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). There are two components to this standard: Initially, a plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of the defendant's denial was sufficiently serious. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). Additionally, the plaintiff must

---

[10] The presumption here is that had Milhouse complied with an order to submit to hand restraints, BOP officials would not have had to employ a use of force team to remove Milhouse from his cell. Milhouse has failed to demonstrate otherwise.

make a "subjective" showing that defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).[11]

This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment." *Little v. Lycoming Cnty.*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

When an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988). Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim. *Lanzaro*, 834 F.2d at 346. Only flagrantly egregious acts or omissions can violate the standard. Medical

---

[11] The "deliberate indifference to serious medical needs" standard is obviously met when pain is intentionally inflicted on a prisoner, where the denial of reasonable requests for medical treatment exposes the inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care. *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

negligence alone cannot result in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health care provider. *White v. Napolean*, 897 F.2d 103, 108-10 (3d Cir. 1990).

In the instant case, throughout the relevant time period, Milhouse was seen on numerous occasions by various medical personnel at USP-Lewisburg. He was repeatedly evaluated and was prescribed medication to ease his discomfort for his various medical conditions, including any resulting from the May 14, 2009 incident. Diagnostic tests were ordered, and performed, to facilitate treatment of his various medical conditions, including his abdominal pain. Unfortunately, despite all the medical intervention, Milhouse has continued to suffer from discomfort and claims that his wounds are still visible. (*See* Doc. 76 ¶ 13.) This is clearly a case where Milhouse has been given medical attention and is dissatisfied with the results. An inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *Durmer*, 991 F.2d at 69; *Spruill*, 372 F.3d at 235. Courts will not second guess whether a particular course of treatment is adequate or proper. *Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997). Moreover, there is nothing in the record demonstrating that any significant delay in examining and treating Milhouse

was deliberate or intentional on the part of any Defendant.[12]  Under these

circumstances and based upon the well-documented course of treatment set forth in

the record, the court finds that Defendants were not deliberately indifferent to

Milhouse's medical needs.  Thus, Milhouse has failed to establish a constitutional

violation and qualified immunity shields Defendants from suit.  Defendants' motion

for summary judgment on this issue will be granted.


**B.**   <u>**Retaliation**</u>

In his amended complaint, Milhouse claims that he has been subjected to

retaliation for "asserting [his] rights and utilizing the administrative remedy

procedures."  (Doc. 31 at 7.)  In their brief in support of the instant motion,

---

[12]  Defendants Bledsoe, Warden of USP-Lewisburg, Maiorana, Associate Warden, Rear, Associate Warden, Passinati, former Captain, and Brown, Health Services Administrator, are non-medical Defendants in this case.  In support of their argument for summary judgment, Defendants claim that to the extent that Milhouse's claims against the non-medical Defendants (Defendants Bledoe, Maiorana, Rear, and Passinati) are based on the supervisory positions of those Defendants, such claims should be dismissed because *respondeat superior* cannot form the basis of a *Bivens* claim, *see Iqbal*, 129 S. Ct. at 1948.  The court agrees. While it is true that as non-medical staff members these Defendants may be held liable for deliberate indifference to a serious medical need if they had a "reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," *Spruill*, 372 F.3d at 236, the record on summary judgment demonstrates that these Defendants had no reason to believe that Milhouse was being mistreated or not treated by medical staff for a serious medical need.

Defendants counter that Milhouse has failed to demonstrate that he suffered some adverse action as to any Defendants sufficient to state a claim of retaliation.

To establish a claim of retaliation, a plaintiff bears the burden of satisfying three elements. First, a plaintiff must prove that he engaged in a constitutionally protected activity. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Second, a prisoner must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." (*Id.*) (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." (*Id.*) (quoting *Suppon v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." *Rauser*, 241 F.3d at 333-34 (quoting *Mount Health Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The mere fact that an adverse action occurs after a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events.[13] *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005).

---

[13] Only where the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, standing alone, support an inference of causation. *Krouse v. Am. Sterilizer Co.*, 126 F3d 494, 503 (3d Cir. 1997).

Turning to the allegations in this case, the court finds that Milhouse has met the first requirement of a retaliation claim. Courts have held that the filing of grievances is protected under the First Amendment right to petition the government for redress of grievances. *See, e.g., Booth v. King*, 346 F. Supp. 2d 751, 762 (E.D. Pa. 2004); *Allah v. Al-Hafeez*, 208 F. Supp. 2d 520 (E.D. Pa. 2002). Hence, Milhouse's conduct was constitutionally protected. As to the remaining elements of a retaliation claim, Milhouse has provided no evidence whatsoever to support his claim that he was extracted from his cell by a use of force team in retaliation for filing grievances. To the contrary, Defendants have presented evidence that Milhouse was extracted from his cell for failing to submit to hand restraints in order to be transferred to another cell. (*See supra* pp. 19-21.) As the court has already agreed with Defendants that the May 14, 2009 cell extraction occurred based on Milhouse's refusal to comply with an order, and Milhouse presents no evidence that the cell extraction was instead in retaliation for filing grievances, the court finds that Milhouse has failed to state a claim of retaliation. Thus, the motion for summary judgment will be granted here in favor of Defendants.

**IV.**   **Conclusion**

For the reasons set forth herein, the motion for summary judgment will be granted in favor of Defendants.

An appropriate order will issue.

                                        s/Sylvia H. Rambo
                                        United States District Judge

Dated:  February 14, 2011.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KAREEM HASSAN MILHOUSE,** | : | **CIVIL NO. 1:CV-09-01365** |
| | : | |
| **Plaintiff** | : | **(Judge Rambo)** |
| | : | |
| **v.** | : | |
| | : | |
| **LIEUTENANT JORDAN,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## O R D E R

In accordance with the accompanying memorandum, **IT IS HEREBY**

**ORDERED THAT:**

1) Defendants' motion for summary judgment (Doc. 53) is **GRANTED** in favor

of Defendants.

2) The Clerk of Court is directed to **ENTER** judgment in favor of Defendants

and against Plaintiff.

3) The Clerk of Court is further directed to **CLOSE** this case.

4) Any appeal from this order is **DEEMED** frivolous and not in good faith.  *See*

28 U.S.C. § 1915(a)(3).

                               s/Sylvia H. Rambo
                                United States District Judge

Dated:  February 14, 2011.